IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

TONY AUDENCIO RAMIREZ,

    Petitioner,                           No. CIV 09-CV-00886 FCD CHS P

    vs.

ANTHONY HEDGPETH,

    Respondent.                      <u>FINDINGS AND RECOMMENDATIONS</u>

    _____/

I.    INTRODUCTION

        Tony Audencio Ramirez is a state prisoner proceeding pro se with a petition for writ of *habeas corpus* pursuant to 28 U.S.C. § 2254. Petitioner challenges his convictions in San Joaquin County Superior Court, Case No. SF099153A, for first degree murder, attempted murder, being a felon in possession of a firearm, being a felon in possession of ammunition, and sale or transportation of a controlled substance. Petitioner claims two violations of his due process rights: (1) that prosecutors failed to timely provide him with exculpatory discovery; and (2) that the trial court erroneously instructed the jury that it was not required to unanimously agree as to one of two

/////

theories of first degree murder advanced by the prosecution.[1] After careful consideration of the record and applicable law, it is recommended that this petition be denied.

II.     FACTUAL AND PROCEDURAL BACKGROUND

The following factual summary is taken from the unpublished opinion of the California Court of Appeal for the Third Appellate District, Case No. CO41230, affirming petitioner's judgment of conviction on appeal:[2]

> A. *Prosecution's Case-In-Chief*
>
> On December 24, 2005, Maria Barragan and her boyfriend went to a friend's house in San Joaquin County. About 9:30 p.m., Barragan spoke on a cell phone with Walter Torres who wanted her to buy him some methamphetamine. After five minutes, Barragan walked outside the house and saw Torres seated in his car, waiting for her to take him to buy methamphetamine. Barragan got into the passenger seat. She and Torres talked for about five minutes.
>
> A maroon car pulled up next to Torres's car. Defendant said, "Hey," which drew Barragan's attention to the car. Barragan saw defendant in driver's seat and another person, who was leaning back, in the passenger seat. Defendant pulled out a gun and started shooting. Barragan heard four or five shots fired. Torres turned, said "[o]h shit," and held Barragan in his arms. Torres was shot once below his neck, twice in his left shoulder, and once in his left arm. There was also a grazing gunshot wound on his right hand.[FN1] After the shooting stopped, Barragan fell out of the car. The maroon car drove off.
>
>> FN1. The bullets recovered from Torres's body were either a .38 Special or .357 Magnum, either of which can be fired from a .357 Magnum revolver.

---

[1] Although his petition does not specify facts supporting Petitioner's alleged claims, this Court is bound to construe liberally a *pro se* pleading. *Johnson v. Meltzer*, 134 F.3d 1393, 1397 (9th Cir. 1998). *Pro se* pleadings are held to less stringent standards than more formal pleadings drafted by lawyers. *See*, *e.g.*, *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Although, typically, conclusory allegations unsupported by a statement of specific facts do not warrant *habeas corpus* relief, *Jones v. Gomez*, 66 F.3d 199, 204 (1995) (internal citations omitted), with this federal petition for writ of *habeas corpus*, Petitioner states identical grounds for relief as previously asserted on direct appeal in state court. Accordingly, and adhering to the rule of liberal construction, this Court will consider the factual allegations set forth by Petitioner on direct appeal in state court in support of his current petition for federal *habes corpus* relief.

[2] CO55538 opinion was lodged in this record as Document 4 on July 21, 2009.

Barragan screamed for her boyfriend and told him that Torres had been shot by "Tony." The boyfriend told her to "[s]hut up" and say nothing.

San Joaquin County Sherriff's deputies were dispatched to the scene. They pulled Torres out of the car and performed CPR on him. He had no signs of life. Barragan did not tell the deputies anything because she was scared and did not know what to do. When a victim advocate drove Barragan home, Barragan saw defendant's mother's van arrive at Barragan's residence. In response, Barragan asked to be taken to her mother's residence on the same street.

On December 30, 2005, Sergeant Michael Jones spoke with Barragan for the first time. She acknowledged that she had more information about the shooting than what she had originally told officers. She was taken to the sherrif's department where she identified a photograph of defendant as the shooter and told a detective what had happened.

Barragan testifed at trial that she had known defendant all her life. Her uncle is married to his aunt.

Barragan testified that the shooter did not have any wounds to his head. After twice testifying that he had no mustache, Barragan expressed uncertainty as to the difference between a mustache and a beard.[FN2] After appearing to resolve her uncertainty, she testified that the shooter had a mustache. Later, after stating that the shooter "probably did" have a mustache and that she "kn[e]w he had a mustache," she inexplicably testified that "[p]robably at the time, he didn't. I don't know."

> FN2. "[THE PROSECUTOR] Q. Did he have a mustache?
>
> "A. A mustache is this, right, or this? A beard is this, a mustache is this? He had a mustache, no beard, right? [¶] That's what you're asking?
>
> "Q. Did he have a mustache?
>
> "A. A mustache, yeah.
>
> "Q. He did?
>
> "A. Yeah."

Barragan testified that no one had suggested to her that defendant was the shooter. She identified him as the shooter because that was "what [she had] seen that night."

In February 2006, Stockton Police officers conducted surveillance looking for defendant. He was seen leaving a residence and entering

3

the backseat of a car. The car was stopped and defendant was handcuffed and searched. During the stop, defendant tried to avoid an officer's grasp. Officer Steve Cole responded by taking defendant to the ground. Defendant's face hit the ground, evidently causing a light abrasion on the right side of his forehead.

The prosecutor showed Officer Cole the booking photograph of defendant. Cole testified that in the photograph, defendant appeared to have marks on his forehead above his right eyebrow. When he observed this injury during the arrest, Cole thought the mark looked fresh and believed it had occurred when he took defendant to the ground.

In the car seat where defendant had been sitting, officers found a clear baggie containing 0.04 grams of cocaine.

Defendant's house was searched pursuant to a warrant. Two firearms, ammunition, and a holster were found. The parties stipulated that neither firearm found was the murder weapon.

Three rolls of film were found in defendant's residence. A digital memory card was found inside a Nikon camera.

B. Defense

On December 24, 2005, defendant and his family celebrated Christmas Eve by making tamales at his house. His cousin, Cynthia Reynoso, was there from about 12:30 p.m. until about 5:45 p.m., and again from about 7:00 p.m. until about midnight.[FN3] Reynoso and several other relatives testified that they never saw defendant leave the house or go outside during that time. Several of the relatives were in the kitchen making tamales, and defendant was never in the kitchen. One cousin explained that the room was open and she would have seen defendant leaving the house if he had done so.

> FN3. Reynoso claimed that she and defendant had been in a dating relationship at the time, even though he had been residing with a girlfriend and their child.

A neighbor, Tafilele Sao, testified that he resided about 10 yards from defendant's home. On December 24, 2005, at approximately 3:00 p.m., he met defendant for the first time. Many neighbors were mingling outside their residences. Sao talked to defendant for 15 to 20 minutes. Sao heard defendant talking to another man about gang-related matters and did not want to overhear the conversation. Sao left about 6:00 p.m. to be with his family. He returned and resumed drinking with defendant at approximately 10:30 p.m.

Defendant testified on his own behalf that he was at the house at the time the murder was committed. He admitted that he possessed cocaine on the date of his arrest. He also admitted that he possessed

4

the firearms and ammunition found at his house.

(Lodged Document 4 at 2-6).

Following his conviction in San Joaquin County Superior Court, Petitioner sought appellate review by the California Court of Appeals for the Third Appellate District. The court affirmed his conviction in a reasoned opinion on April 7, 2008. Petitioner next filed a petition for review in the California Supreme Court. The petition was summarily denied on June 11, 2008. Petitioner did not file any petitions for writ of *habeas corpus* in state court. Petitioner filed this federal petition on October 22, 2008. Respondent filed an answer on July 20, 2009. Petitioner did not file a traverse.

III.   APPLICABLE STANDARD OF HABEAS CORPUS REVIEW

This case is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of *habeas corpus* filed after its enactment on April 24, 1996. *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *Jeffries v. Wood*, 114 F.3d 1484, 1499 (9th Cir. 1997). Under AEDPA, an application for a writ of habeas corpus by a person in custody under a judgment of a state court may be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a); *Williams v. Taylor*, 529 U.S. 362, 375 n. 7 (2000). Federal *habeas corpus* relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Although "AEDPA does not require a federal habeas court to adopt any one methodology," *Lockyer v. Andrade*, 538 U.S 63, 71 (2003), there are certain principles which guide its application.

First, AEDPA establishes a "highly deferential standard for evaluating state-court

5

rulings." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). Accordingly, when determining whether the law applied to a particular claim by a state court was contrary to or an unreasonable application of "clearly established federal law," a federal court must review the last reasoned state court decision. *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004); Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002). Provided that the state court adjudicated petitioner's claims on the merits, its decision is entitled to deference, no matter how brief. *Lockyer*, 538 U.S. at 76; *Downs v. Hoyt*, 232 F.3d 1031, 1035 (9th Cir. 2000). Conversely, when it is clear that a state court has not reached the merits of a petitioner's claim, or has denied the claim on procedural grounds, AEDPA's deferential standard does not apply and a federal court must review the claim *de novo*. *Nulph v. Cook*, 333 F.3d 1052, 1056 (9th Cir. 2003); *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

Second, "AEDPA's, 'clearly established Federal law' requirement limits the area of law on which a habeas court may rely to those constitutional principles enunciated in U.S. Supreme Court decisions." *Robinson*, 360 F.3d at 155-56 (citing *Williams*, 529 U.S. at 381). In other words, "clearly established Federal law" will be " the governing legal principle or principles set forth by [the U.S. Supreme] Court at the time a state court renders its decision." *Lockyer*, 538 U.S. at 64. It is appropriate, however, to examine lower court decisions when determining what law has been "clearly established" by the Supreme Court and the reasonableness of a particular application of that law. *See Duhaime v. Ducharme*, 200 F.3d 597, 598 (9th Cir. 2000).

Third, the "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have "independent meanings." *Bell v. Cone*, 535 U.S. 685, 694 (2002). Under the "contrary to" clause, a federal court may grant a writ of *habeas corpus* only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides the case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams*, 529 U.S. at 405. It is not necessary for the state court to cite or even to be aware of the controlling federal authorities "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002). Moreover, a state court opinion need not

6

1  contain "a formulary statement" of federal law, but the fair import of its conclusion must be
2  consistent with federal law. *Id.*

3  Under the "unreasonable application" clause, the court may grant relief "if the state
4  court correctly identifies the governing legal principle...but unreasonably applies it to the facts of
5  the particular case." *Bell*, 535 U.S. at 694. As the Supreme Court has emphasized, a court may not
6  issue the writ "simply because that court concludes in its independent judgment that the relevant
7  state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*,
8  529 U.S. at 410. Thus, the focus is on "whether the state court's application of clearly established
9  federal law is *objectively* unreasonable." *Bell*, 535 U.S. at 694 (emphasis added).

10  Finally, the petitioner bears the burden of demonstrating that the state court's
11  decision was either contrary to or an unreasonable application of federal law. *Woodford*, 537 U.S.
12  at 24 ; *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).

13  IV.   DISCUSSION

   A.   *BRADY* DISCLOSURE[3]

15  Petitioner claims that prosecutors violated his due process right to a fair trial by
16  failing to timely produce exculpatory evidence relevant to his defense. Specifically, Petitioner
17  claims that during a warranted search of his home following his arrest, law enforcement officers
18  seized two cameras, three rolls of film, and media cards or disks containing photographic images
19  of Petitioner. These photographic images, according to Petitioner, could have been used to impeach
20  the trial testimony of two prosecution witnesses because they demonstrated the existence of injuries
21  sustained to Petitioner's face prior to the day of his arrest. Petitioner contends that he presented

---

[3] In a related claim on direct appeal, Petitioner additionally alleged that the prosecution failed to provide reciprocal discovery as required by CAL. PENAL § 1054.1. Because federal *habeas corpus* relief may be granted only for a violation of the Constitution or laws of the United States, the Court does not address this claim herein. 28 U.S.C. § 2254(a); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (holding that federal *habeas corpus* relief is not available to remedy alleged errors of state law). *See also Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991) (federal courts sitting in *habeas corpus* do not review question of state evidence law).

7

"substantial alibi evidence" at trial that, combined with the impeaching photographs, would have rendered a reasonable juror receptive to rejecting Maria Barragan's identification of Petitioner. The delayed production of the photographs, however, prevented Petitioner from effectively impeaching (1) Maria Barragan's testimony identifying Petitioner as the shooter of Walter Torres, despite failing to recall whether or not Petitioner had a mustache or facial injuries at the time; and (2) Officer Cole's testimony that Petitioner suffered injuries to his face during his arrest.

Petitioner began seeking discovery of the photographs on August 30, 2006. Petitioner's discovery requests continued, both formally and informally, over the next several months. On November 20, 2006, Petitioner informed the prosecutor that the seized film and digital memory card yet to be processed. The prosecutor made contact with the police detective in possession of the film and digital memory card to request copies of the photographs. On December 15, 2006, the prosecutor purportedly received hard copies of all photographic images developed from the film and digital memory card seized during the search of Petitioner's residence. The prosecutor forwarded copies of all received photographs to Petitioner's counsel. Trial proceedings commenced on January 4, 2007.

Maria Barragan testified on January 23, 2007. She identfied Petitioner as the person she had seen shoot Walter Torres, but explained that she had not seen any scars, wounds, or marks on Petitioner's face. She also expressed uncertainty as to whether or not Petitioner had a mustache at the time of the shooting.

Officer Steve Cole took the witness stand on January 26, 2007. Officer Cole testified that he knocked Petitioner to the ground while placing him under arrest, and that Petitioner suffered an injury to his head during this encounter. Officer Cole testified that the head injury was accurately reflected in Petitioner's booking photograph.

At some point between January 22 and January 26, 2007, Petitioner's counsel notified the prosecutor that he was unable to determine the individual sources of each of the discovered photographs. The prosecutor contacted the police investigator and requested that he

8

reproduce the photographs, this time taking care to keep the photographs from each source separated. On January 30, 2007, the investigator complied with the prosecutor's request. Upon inspection of the newly produced and organized photographs, however, the prosecutor discovered for the first time photographs depicting injuries to Petitioner's head that preexisted his arrest. He promptly produced these photographs to Petitioner.

On January 31, 2007, Petitioner moved for a mistrial, arguing that had the newly discovered photographs been made available prior to trial, he would have used them to impeach the trial testimony of Barragan and Officer Cole. On February 7, 2007, the trial court denied the motion after determining that Petitioner had suffered no prejudice by the late production of the photographs. Key to the court's ruling was the availability of both Barragan and Officer Cole for recall and cross examination regarding the photographs.[4] Petitioner, however, chose not to recall either witness for impeachment purposes.

It is well established that "the suppression by prosecution of evidence that is favorable to an accused...violates due process where the evidence is material to either guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). *See also Youngblood v. West Virginia*, 547 U.S. 867, 869 (2006) ("A *Brady* violation occurs when the government fails to disclose evidence materially favorable to the accused."). The *Brady* rule imposes upon the prosecution an affirmative duty to disclose both exculpatory and impeachment evidence, *United States v. Bagley*, 473 U.S. 667, 676 (1985), and is applicable even when there has been no discovery request by the accused. *United States v. Agurs*, 427 U.S. 97, 107 (1976). Moreover, the *Brady* rule applies to an agent acting on behalf of the prosecution and, therefore, constitutional error may occur even when exculpatory or impeachment evidence is known, for example, "only to police investigators and not to the prosecutor."

---

[4] Petitioner also requested, in the alternative, that the jury be informed of the prosecution's delay in producing the late discovered photographs to the defense. The trial court did not expressly address this request.

*Youngblood*, 547 U.S. at 869-70. *See also Kyles v. Whitley*, 514 U.S. 419, 438 (1995) ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police.").

A *Brady* violation is threefold: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; the evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). *See also Banks v. Dretke*, 540 U.S. 668, 691 (2004) (reiterating the three part test set out in *Strickler*); *Silva v. Brown*, 416 F.3d 980, 985 (9th Cir. 2005) (same). In order to establish prejudice, a petitioner must demonstrate "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 683. *See Strickler*, 527 U.S. at 289 (In order to obtain relief, a petitioner "must convince us that 'there is a reasonable probability' that the result of the trial would have been different had the suppressed documents been disclosed to the defense"). "The question is not whether petitioner would more likely than not have received a different verdict with the evidence, but whether 'in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Strickler*, 527 U.S. at 289 (quoting *Kyles*, 514 U.S. at 434). *See also Bagley*, 473 U.S. at 678 ("[A] constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial."); *Silva*, 416 F.3d at 986 (establishing a *Brady* violation where "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."). Once the materiality of the suppressed evidence is established, no further harmless error analysis is required. *Kyles*, 514 U.S. at 435-36. Thus, "[w]hen the government has suppressed material evidence favorable to the defendant, the conviction must be set aside." *Silva*, 416 F.3d at 986.

The California Court of Appeal considered and rejected Petitioner's *Brady* claim on the merits. The appellate court explained its reasoning as follows:

10

Defendant's due process claim fails because the late discovered photographs were not material. There is no reasonable probability that earlier disclosure of the photographs would have altered the trial result. (*People v. Zambrano*, *supra*, 41 Cal.4th at p. 1132.)

Barragan had known defendant her whole life and viewed him under enormously stressful conditions when he suddenly appeared on the scene and fired several gunshots into the car in which she and Torres were sitting. The fact that she recognized the person she had known her whole life, but did not notice injuries that she had been unaware of, is hardly surprising. As the prosecutor argued in summation, Barragan was "focused on [defendant's] eyes and him with the gun." Under these circumstances, any reasonable person would have been similarly focused. It is not reasonably probable that her failure to notice facial injuries could have successfully rebutted her identification of defendant as the shooter.

Defendant's claim that Barragan failed to see his mustache is unavailing. After testifying that the shooter had no mustache, Barragan evidently reconsidered the definition of beard and mustache and concluded that he did have a mustache. Later, after testifying that the shooter probably had a mustache and that she knew he had a mustache, she inexplicably opined that he probably did not have a mustache and that she did not know. In its entirety, her testimony neither supports nor refutes defendant's claim that she failed to see a mustache.

In order to find that Barragan had *mistakenly* misidentified defendant, the jury would have had to conclude that she had seen a shooter who looked exactly like someone she had known her whole life but who lacked the head injuries that were visible in the late discovered photographs. It is not reasonably likely that the jury would have drawn this inherently improbable conclusion.

No evidence supported the finding that Barragan *intentionally* or willfully misidentified defendant or had any motive for doing so. In contrast, the alibi witnesses who were members of defendant's family had a strong motive to fabricate. The only nonfamily alibi witness was Sao, who was not present from about 6:00 p.m. until approximately 10:30 p.m., an hour after the shooting. Defendant's claim that he presented "substantial alibi evidence," which could persuade a reasonable juror to reject Barragan's identification of him, has no merit.

Finally, the discovery failure did not unduly emphasize the testimony of Officer Cole. Defendant had suffered facial injuries in an automobile accident the month before the shooting. Because Cole had not seen defendant's face before he took defendant to the ground, his testimony did not stand for the proposition that defendant's face had been uninjured prior to that time.

1    Because AEDPA establishes a highly deferential standard for the evaluation of a
2 state-court ruling, a federal court considering a petitioner's federal *habeas corpus* petition must give
3 deference to the last reasoned state-court decision on the merits of a petitioner's claim.  Here, the
4 California Court of Appeal determined that Petitioner's due process claim must fail because the late
5 discovered photographs were not material, and this Court agrees.  The late discovery of evidence
6 is not a due process violation if the defense receives the evidence in time to make use of it at trial.
7 *United States v. Gomez-Orduno*, 235 F.3d 453, 461-62 (9th Cir. 2000).  *See also United States v.*
8 *Span*, 970 F.2d 573, 583 (9th Cir. 1992) ("[T]he failure to disclose allegedly material evidence may
9 not be prejudicial so long as it occurs at a time when disclosure would be of value to the accused."
10 (internal citations omitted)).  Although the photographs were produced to Petitioner after both
11 Barragan and Officer Cole had testified, the trial court determined that any prejudice potentially
12 suffered by Petitioner due to the delayed disclosure was mitigated by the availability of both
13 witnesses to be recalled for further cross-examination by Petitioner.    Petitioner has failed to
14 demonstrate a reasonable probability that late production of the photographs depicting his pre-arrest
15 facial injuries altered the result of his trial in such a way as to undermine confidence in the verdict.
16  Petitioner has not demonstrated that the decision of the California Court of Appeal was contrary to
17 or an unreasonable application of clearly established federal law, or that it was based on an
18 unreasonable determination of the facts.

19    B.    CALIFORNIA CRIMINAL JURY INSTRUCTION NO. 521

20    Petitioner claims that the trial court violated his due process rights by instructing the
21 jury that:

> The defendant has been prosecuted for First Degree Murder under two theories: (1) the Murder was willful, deliberate, and premeditated and (2) the Murder was perpetrated by shooting  a firearm from a vehicle.
> . . . .
> You may not find the defendant guilty of First Degree Murder unless all of you agree that the People have proved that the defendant committed First Degree Murder. *But all of you do not need to agree on the same theory.*

12

(Clerk's Transcript on Appeal at 893 (emphasis added)). *See also* CALCRIM No. 521. Petitioner argues that the difference between the moral culpability associated with premeditated murder and the moral culpability associated with a killing perpetrated by shooting a firearm from a vehicle requires a jury to agree unanimously on one theory of first degree murder or the other. In order to be successful on this claim, Petitioner must demonstrate that the claimed error in the jury instructions so infected the trial as to render the proceeding unfair. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991).

In *Schad v. Arizona*, 501 U.S. 624, 629 (1991), a defendant was charged with first degree murder on alternative theories: that the murder was committed during the course of a robbery (felony murder) or that it was premeditated and deliberated. *Schad* argued, as Petitioner does here, that the jury should have been instructed that it must unanimously agree on the theory of first degree murder supporting his conviction. The Supreme Court rejected this claim, explaining in *Schad* that:

> Petitioner's jury was unanimous in deciding that the State had proved what, under state law, it had to prove: that petitioner murdered either with premeditation or in the course of committing a robbery. The question still remains whether it was constitutionally acceptable to permit the jurors to reach one verdict based on any combination of the alternative findings. If it was, then the jury was unanimous in reaching the verdict, and petitioner's proposed unanimity rule would not help him. If it was not, and the jurors may not combine findings of premeditated and felony murder, then petitioner's conviction would fall even without his proposed rule, because the instructions allowed for the forbidden combination.
>
> In other words, petitioner's real challenge is to Arizona's characterization of first-degree murder as a single crime as to which a verdict need not be limited to any one statutory alternative, as against which he argues that premeditated murder and felony murder are separate crimes as to which the jury must return separate verdicts.

*Id.* at 630-31. The Court determined that, under Arizona law, "neither premeditation nor the commission of a felony is formally an independent element of first-degree murder; they are treated as mere means of satisfying a *mens rea* element of high culpability." *Id.* at 638. Accordingly, permitting jurors to rely on both theories to reach a single verdict did not violate due process. Finding that there was substantial historical and statutory precedent for equating mental states of

13

premeditated murder and felony murder, the Court also cautioned that:

> [i[f...two mental states are supposed to be equivalent means to satisfy the *mens rea* element of a single offense, they must reasonably reflect notions of equivalent blameworthiness or culpability, whereas a difference in their perceived degrees of culpability would be a reason to conclude that they identified different offenses altogether. Petitioner has made out no case for such moral disparity in this instance.

Here, Petitioner suggests there is no equivalent moral culpability between murder committed with premeditation or by a shooting a firearm from a motor vehicle. Respondent asserts that the trial court properly instructed the jury that it need not unanimously agree on the same theory of first degree murder in order to find Petitioner guilty of the charged crime. In the alternative, Respondent argues that any error in failing to require a unanimous verdict on the first degree murder theory in Petitioner's case did not have a substantial and injurious effect on the verdict because the jury unanimously found true the drive-by-shooting special circumstance, indicating that it unanimously found Petitioner guilty under the drive-by-shooting theory of first degree murder. Petitioner responds to that argument by reasoning that under the drive-by-shooting theory of first degree murder, the jury was required to find that Petitioner intended to kill Walter Torres, while the drive-by-shooting special circumstance was satisfied if Petitioner intended to kill either Walter Torres or Maria Barragan.[5] The California Court of Appeal considered and rejected Petitioner's claim on the merits. The appellate court explained its reasoning as follows:

> The drive-by-shooting theory of first degree murder required that defendant "intentionally shot at *a* person" who was outside the vehicle, and that defendant "intended to kill *that* person." (Italics added.). But the theory did *not* require that the person who was intentionally shot at, and whom defendant intended to kill, was the *same* person who *was killed* as a result of the shooting. Thus, if

---

[5] The instruction on the drive-by-shooting theory of first degree murder required that defendant: (1) shot a firearm from a motor vehicle; (2) intentionally shot at a person who was outside the vehicle he shot the firearm from ; and (3) intended to kill that person. CALCRIM No. 521 (mod.). The instruction on the drive-by-shooting special circumstance required that defendant: (1) shot a firearm from a motor vehicle, killing Walter Pineda Torres ; (2) "intentionally shot at a person who was outside the vehicle ; and (3) at the time of the shooting, the defendant intended to kill. CALCRIM No. 735 (mod.).

14

> defendant intentionally shot at Barragan, intending to kill Barragan, but Torres was struck and killed, defendant was guilty under the drive-by-shooting theory.
>
> Moreover, the jury instruction on "Intent to Kill Related to First or Second Degree Murder" provided that, "[i]f the defendant intended to kill one person but by mistake or accident killed someone else instead, then the crime, if any, is the same as if the intended person had been killed." (CALCRIM No. 562)
>
> This transferred intent instruction applied to the drive-by-shooting theory of first degree murder. It allowed the jury to convict defendant even if he "shot at Barragan rather than at Torres." Thus, neither the drive-by-shooting theory nor the drive-by-shooting special circumstance required the jury "to find an intent to kill Torres," as opposed to Barragan. Under these circumstances, the verdict was unanimous as to at least one theory and any instructional error under *Schad* was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711].)

As discussed above, AEDPA establishes a highly deferential standard for the evaluation of a state-court ruling. This Court, therefore, must give deference to the last reasoned state-court decision on the merits of Petitioner's claim. Here, the California Court of Appeal rejected Petitioner's due process claim on the grounds that any alleged instructional error was harmless because the jury unanimously found Petitioner guilty as to at least one theory of first degree murder: drive-by shooting. Petitioner has failed to demonstrate that any alleged instructional error so infected the trial as to render the whole proceeding unfair. Moreover, Petitioner has not demonstrated that the decision of the California Court of Appeal was contrary to or an unreasonable application of clearly established federal law, or that it was based on an unreasonable determination of the facts.

V.   CONCLUSION

Accordingly, IT IS RECOMMENDED that Petitioner's petition for writ of *habeas corpus* be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within twenty-one days after being served with these findings and recommendations, any party may file written

objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within seven days after service of the objections. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991). In any objections he elects to file petitioner may address whether a certificate of appealability should issue in the event he elects to file an appeal from the judgment in this case. *See* Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED: June 3, 2010

/s/ Charlene H. Sorrentino
CHARLENE H. SORRENTINO
UNITED STATES MAGISTRATE JUDGE